UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                           No. 1:16-cr-04574-JCH-1

NICHOLAS WIGGINS,

    Defendant.

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO DISMISS THE INDICTMENT**

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss the Indictment ("Motion to Dismiss"), [Doc. 55] on the ground that government agents allegedly destroyed exculpatory photographic evidence critical to his defense. Defendant moves, in the alternative, to suppress evidence of firearms on the same basis. The Court held a hearing on the Motion to Dismiss on June 27, 2018. The Court, having considered the briefs, relevant law, and being otherwise fully-informed, finds that the motion should be denied.

**I.    BACKGROUND**

After receiving a tip from a confidential informant that Defendant sold drugs from his wife's home at 10009 Range Road SW in Albuquerque ("Range Road"), the Bernalillo County Sherriff's Office (BCSO) officers began building a heroin distribution case against Defendant. A number of facts indicated the informant's tip was accurate, so in May 2016 officers secured a warrant from a state judge to search Range Road. Following the search warrant's execution there, BCSO Detective Garcia wrote in a report that officers found Defendant in a downstairs bedroom. They arrested him and searched the bedroom, finding a total of three firearms. In a

post-search report, Garcia wrote that one handgun lay on the ground next to the bed, appearing as if it had been thrown, while another was tucked under a blanket on the bed close to where Defendant was found standing. The third gun, a fully automatic rifle, officers found in a top dresser drawer mixed together with Defendant's personal belongings. Drug Enforcement Agency agents participated in the warrant's execution. The firearms ended up in DEA's custody. In November 2016 Defendant was charged as a felon in possession of firearms and ammunition under 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

In his Motion to Dismiss, Defendant contends that while executing the warrant, BCSO officers took pre-search photographs of Range Road, including photographs of the firearms that officers seized. *See* Def.'s Mot. to Dismiss, 1. In preparation of his defense, counsel for Defendant asked the prosecution about the photographs' whereabouts.[1] *Id*. at 2. According to Defendant, the United States first responded that officers could not locate the photographs, but then on May 15, 2018 – about a month before this case was previously set for trial – the United States told counsel for Defendant that the photographs no longer exist. *Id*.

According to Defendant, those photographs are critical to his defense for two reasons. First, since "this case hinges on the location of the firearms and whether they were strewn about as the officers claim or if they were stored in their respective cases hidden from sight," photographic evidence of the firearms would show that they were concealed within gun gases in the bedroom's closet and underneath the bed, rebutting Detective Garica's allegedly false statement that the guns were found in a dispersed manner and in plain view. *Id*. at 4. Second, Defendant asserts that the photographs would show that he did not possess the concealed, enclosed, and out-of-sight firearms. *Id*. Based on these facts, it should have been obvious to

---

[1] Counsel for Defendant does not say when she first contacted the United States Attorney about the photographs.

government agents that the photographs would play a significant role in his defense, thereby triggering the United States' constitutional duty to preserve the photographs on Defendant's behalf under the United States Supreme Court's decision in *California v. Trombetta*, 467 U.S. 479 (1984). *Id*. at 3-7. Without them, Defendant argues that he will have no evidence at trial to rebut Garcia's allegedly false narrative that the guns were in open view. *Id*. at 4. Defendant stresses that testifying on the stand to rebut Garcia's version of events would likely violate his Fifth Amendment right to refrain from testifying. *See* Def.'s Reply, ¶ 1, Doc. 63. Without the critical photographic evidence, Defendant maintains that will not receive a fair trial such that the indictment must either be dismissed, or alternatively, evidence of the seized firearms must be suppressed. *See* Def.'s Mot. to Dismiss at 7.

In its Response, the United States acknowledges that the photographs existed at one time, but then provides virtually no explanation for their disappearance, saying only that "according to Detective Garcia, no copies of [the] photographs exist." Govt.'s Resp., ¶ 6, Doc. 57. However, the United States maintains that even if the photographs existed, Defendant cannot explain how they would rebut a claim that he lacked possession of the firearms. *Id*. at 5. He clearly had possession of the firearms, the United States says – after all, they were seized while arresting him. *Id*. at ¶ 1. Maybe the photographs could have impeachment value against Detective Garcia, the United States acknowledges, but they are far from exculpatory. *Id*. at 5-6. The United States also contends that Defendant would not be prejudiced at trial without the photographs because he can put on substitute evidence – namely, he can call Garcia to the stand and cross examine him. *Id*. at 6. Or, if Defendant has a different version of events than that relayed by Garcia, Defendant can testify on his own behalf. *Id*. According to the United States, Defendant can also introduce photographs that his wife took immediately after officers executed the warrant. *Id*. His wife's

photographs depict gun cases on the bedroom's floor and in other locations that are consistent with Defendant's rendering of events. *Id*.

The Court held a hearing on the Motion to Dismiss on June 27, 2018. Two witnesses testified – Garcia and Christine Gabaldon, Defendant's wife. Gabaldon rented Range Road, and Defendant sometimes stayed overnight there. *See* Hr'g Tr. on Mot. to Dismiss Indictment, 6:12-13; 32:15-16 ("Mot. Hr'g.") Gabaldon testified that on the day officers executed the search warrant, she was on the telephone with Defendant, telling him where to find her house key that was hidden under a rock. *Id*. 8:22-25 – 9:1-8; 40:1-8 ("Mot. Hr'g."). Defendant entered the house, and as Defendant and Gabaldon continued their discussion Gabaldon suddenly heard raised voices and loud crashing noises on Defendant's end of the line. *Id.* 9:5-14. The phone went dead. *Id*. 9:14. Gabaldon left work immediately, arriving at Range Road within five minutes. *Id*. 9:25 – 10:1. She saw BCSO officers executing the warrant, and she told them she had firearms in the house and that she was a gun owner, identifying their locations in the closet and under the bed. *Id*. 46:4-14.

Gabaldon testified that the firearms were hers and that she had purchased all three in 2015 and 2016. *Id*. 34:9-25. She testified that they were never visible when Defendant was in her house, that she never told Defendant about them, that he did not know of their existence, and that she was "the only one that had access to those firearms." *Id*. 35:5-16; 37:23. She also described how the day officers executed the search warrant, all three firearms were enclosed in cases. One firearm, the Glock, was enclosed in a case and stored underneath her bed. *Id*. 10:22-25 – 11:1. The other two firearms – the Taurus and the Masterpiece – were stored in gun cases on a shelf in her bedroom closet. *Id*. 14:1-17; 15:24-25. Gabaldon purchased two guns, the Glock and the Masterpiece, from a couple in 2015. *Id*. 34:9-23. She purchased the Taurus in May 2016 – the

same period Defendant was arrested. *Id*. 34:25. She testified that none of her four children were allowed into her bedroom where the firearms were stored without her permission. *Id*. 37:23-25 – 38:1-2.

Once officers completed their work at Range Road, Gabaladon photographed the master bedroom that same evening. *Id*. 23:13-19; 27:4. The photographs show gun cases lying on the floor or her disheveled master bedroom. *See* Def.'s Photographs of Range Road Master Bedroom, Exs. A, A-1, B, G.

On direct examination of Detective Garcia, Garcia testified that he was the "case agent," meaning he was "in charge of everything … includ[ing] the initial investigation, the controlled buys, search warrant, and everything following that." Mot. Hr'g, 54:19-23. When officers executed the search warrant on Range Road, Defendant was the only non-law enforcement person there. *Id*. 55:22-25. Officers found Defendant in the downstairs master bedroom standing at the foot of the bed. *Id*. 56:1-10. After placing Defendant in handcuffs, removing him from the bedroom, and conducting a protective sweep of the house, Garcia and other detectives went back into the bedroom. *Id.* 57:1-25 – 57:1-9. At that point, Garcia saw the Taurus, not in a case, on the bedroom floor located less than five feet from where Defendant was found standing. *Id*. 59:2-10; 60:19-22. Garcia directed Detective Nance to begin photographing the house to capture its pre-search condition. *Id*. 58:1-14. Nance photographed the Taurus on the floor, and then officers picked it up and inventoried it on the kitchen table that officers used as a workstation. *Id*. 59:12-15. At that point, officers began searching the whole house. *Id*. 60:1-8. As Garcia began searching the master bedroom bed, he picked up a pillow next to where Defendant was standing. *Id*. 60:4-5. Under the pillow was another firearm, the Glock, in a case. *Id.* 60:7-8. Garcia found a third firearm, the Masterpiece, in a dresser's middle drawer in the bedroom. *Id*. 61:7-10. It was

5

sitting on top of clothes and next to Defendant's wallet, not in a gun case. *Id*. 61:10-14. Garcia testified that before physically moving and inventorying the firearms, officers photographed them as they were found. *Id*. 61:18-20. He testified that none of the firearms were stored in the closet or underneath the bed. *Id.* 62:14-19. Garcia said officers normally leave gun cases behind because serve no evidentiary purpose. *Id*. 63:5-8.

When asked what procedure officers would follow in photographing the firearms if they had been enclosed in cases, Garcia testified that officers would photograph the case "as is," then they would open the case and photograph the firearm within. *Id*. 62:22-25 – 63:1. When asked how officers maintain the photographs, Garcia testified that the police-photographer (in this case Detective Nance) would copy the photographs onto a disk. *Id*. 64:4-9. The disk would be given to a case agent, who then gave it to a supervisor, who in turn gives it to a secretary to turn over to prosecuting authorities. *Id*. 64:7-14.

Garcia was the case agent. *Id*. 64:19-21. That means he received Nance's photographs on the disk. *Id*. 64:22-24. He then gave the disk to his supervisor, testifying that he never saw the photographs after that and never made copies of those photographs. *Id*. 65:8-10; 16-17. When asked what efforts he made to locate the photographs in connection with this Motion to Dismiss, Garcia testified that he had inquired of the various agencies and people who handled the disk, but had not met with success. *Id*. 66:9-15. He testified that Detective Nance is now out of state, but that Garcia used Nance's computer credentials to access his computer profile. *Id*. 66:15-20. Garcia searched through nearly 1,000 photographs saved on Nance's computer, but none of them were of Range Road. *Id*. Garcia testified that he exhausted all known available avenues for locating the photographs. *Id*. 66:21-24.

On cross examination of Detective Garcia, when asked whether BSCO procedures required him to deliver the photographs to the "evidence room," Garcia answered affirmatively, and stated that he did not follow this procedure. *Id*. 68:22-24; 69:20-25. But he also suggested that he gave the photographs directly to his supervisor. *Id*. 68:20-21. When asked whether he violated BCSO procedures for failing to deliver the photographs to the evidence room, Garcia answered yes. *Id*. 69:20-25. Garcia testified that after this case was referred for prosecution from state to federal authorities, BCSO did not maintain custody of the photographs in its secured database, although Garcia also testified that he was unaware BCSO had a secured database. *Id*. 77:11-21; 78:11. On further cross examination of Garcia, Defense also questioned whether he found the gun on the bed under a pillow as he testified, or whether it was under a blanket, as he wrote in his report. *Id.* 72:7-25 – 73:1-20. Defense also questioned Garcia's memory about the Masterpiece firearm's location in the dresser drawer. *Id*. 73:24-25 – 75:1-23.

At the hearing's conclusion, the Court explained to the parties that Detective Garcia did not appear knowledgeable about the photographs' storage, and asked the United States Attorney what else he could do to locate the photographs. *Id*. 93:15-19. The United States said it would ask BSCO's information technology ("IT") unit to conduct further searches for the photographs. *Id*. 92:14-17. The United States volunteered a deadline of one week – until July 4, 2018 – to inform the Court and Defense of its search results. *Id.* 96:3.

A week passed and the United States never complied with its own deadline. However, on July 12, 2018 the United States did inform the Court and Defense Counsel in an e-mail that BSCO's IT located a computer previously used by Detective Nance and that IT was determining whether any photographs of Range Road were stored there. To date, the United States has not informed the Court of that particular search's results. On August 6, 2018 the United States e-

mailed the Court and Defense Counsel three photographic images the United States alleges were retrieved from Detective Nance's e-mail account.[2] Two images purportedly showed a Masterpiece firearm and loaded firearm clip held by a gloved-handed officer with an opened drawer containing men's socks in the background. The third photograph allegedly showed two boxes of ammunition. According to the United States, metadata associated with the photographs showed they were taken on the day of the search, May 19th, 2016, between 6:09 and 6:41 p.m.[3]

## II. LEGAL STANDARD

The Supreme Court's decisions in *California v. Trombetta* and *Arizona v. Youngblood*, 488 U.S. 51 (1988) govern the constitutionality of lost or destroyed evidence by the prosecution. The Due Process Clause of the Fifth Amendment "imposes duties on the government not to deprive a defendant of exculpatory evidence." *United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016); *United States v. Parker*, 72 F.3d 1444, 1451 (10th Cir. 1995) ("Under the Due Process clause of the Fourteenth Amendment, the Supreme Court has developed what might loosely be called the area of constitutionally guaranteed access to evidence.") (internal quotations omitted). "To the extent the Constitution's due process guarantees impose a duty upon the government to preserve evidence, … the 'duty must be limited to evidence that might be expected to play a significant role in the suspect's defense.'" *United States v. Ludwig*, 641 F.3d 1243, 1253–54 (10th Cir. 2011) (quoting *Trombetta*, 467 U.S. at 488–89.) Under *Trombetta*, lost or destroyed evidence is constitutionally material when (1) its exculpatory value was "apparent

---

[2] The United States did not explain whether the photographs derived from Detective Nance's e-mail account were connected to the search of the computer Nance previously used.

[3] The United States did not explain whether these photographs were taken before or after the search. Nor did the United States request a hearing to provide the photographs evidentiary context. Thus, at this stage, the photographs have indeterminate evidentiary value.

8

before the evidence was destroyed" and (2) it is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. Where material, exculpatory evidence in the government's possession is not preserved and disclosed to the defense, the Due Process Clause is violated, regardless of whether the government acted in good faith or bad faith. *See Youngblood,* 488 U.S. at 57 (referring to *Brady v. Maryland,* 373 U.S. 83, 87 (1963)). Materiality means that the missing evidence "would have made a different result reasonably probable." *Kyles v. Whitley,* 514 U.S. 419, 441 (1995). The defendant bears the burden of showing that the missing evidence was materially exculpatory at the time it was lost or destroyed. *See Harry*, 816 F.3d at 1276.

The defendant must meet "[a] higher standard of proof … when the evidence is only potentially useful." *United States v. Tyerman*, 701 F.3d 552, 560 (8th Cir. 2012). In *Youngblood,* the Supreme Court extended *Trombetta* and held that in cases where "the exculpatory value of the evidence is indeterminate and all that can be confirmed is that the evidence was potentially useful for the defense, then a defendant must show that the government acted in bad faith in destroying the evidence." *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994) Under *Youngblood*, the "inquiry into bad faith must necessarily turn on the [government's] knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 911. "*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction. The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *United States v. Zaragoza-*

*Moreira*, 780 F.3d 971, 977 (9th Cir. 2015). Thus under both *Trombetta* and *Youngblood* the exculpatory value of the evidence in question must be apparent.

"[T]he district court's determination regarding bad faith is a mixed question of fact and law, in which the quintessentially factual question of intent predominates...." *United States v. Richard,* 969 F.2d 849, 853 (10th Cir.1992). "The mere fact that the government controlled the evidence and failed to preserve it is by itself insufficient to establish bad faith." *Id.* at 853–54. "[M]ere negligence on the government's part in failing to preserve such evidence is inadequate for a showing of bad faith." *Bohl,* 25 F.3d at 912. The Court of Appeals for the Tenth Circuit has held that the following five factors bear on the inquiry into bad faith:

> (1) whether the government had explicit notice that [the defendant] believed the [evidence] was exculpatory; (2) whether the claim that the evidence is potentially exculpatory is conclusory, or instead backed up with objective, independent evidence ...; (3) whether the government could control the disposition of the evidence once [the defendant] indicated that it might be exculpatory; (4) whether the evidence was central to the case; and (5) whether the government offers any innocent explanation for its disposal of the evidence.

*United States v. Simpson*, 845 F.3d 1039, 1059 (10th Cir. 2017) (internal quotation marks omitted). It is the defendant's burden to demonstrate that the government acted in bad faith. *See United States v. Pedraza,* 27 F.3d 1515, 1527 (10th Cir.1994).

### III. DISCUSSION

Defendant contends that his due process rights were violated under the standard articulated in *Trombetta*, thereby eliminating any claim he may have under *Youngblood*. *See* Def.'s Mot. to Dismiss at 6 ("the defense submits that this Court's analysis is informed by the holding of *Trombetta*.") Therefore, under the first prong of *Trombetta*, the Court first analyzes whether the photographs' exculpatory value was "apparent" to government agents before they

10

were lost or destroyed. *Trombetta*, 467 U.S. at 489. "Defendant bears the burden of showing that the missing evidence met that standard when it was lost." *Harry*, 816 F.3d at 1276.

In *Trombetta*, after the defendants submitted to a breath-analysis test, the officer cleared the breathalyzer machine with clean air, thereby destroying the breath samples. 467 U.S. at 483. The defendants complained that as a consequence they could not test the samples to challenge the breathalyzer results, and so argued that those results should be suppressed. *Id*. The state court agreed, but the Supreme Court reversed. *Id*. at 489. The Court ruled that lost or destroyed evidence is constitutionally material when (1) its exculpatory value was "apparent before the evidence was destroyed" and (2) it is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89. The Court held that neither of these prongs were met. *Id*. First, the breathalyzer had a track record of being highly accurate; the breath samples "would simply confirm" the accuracy of the breathalyzer's results (*i.e.* the samples were inculpatory, not exculpatory.) *Id*. at 489. Second, the defendants had "alternative means of demonstrating their innocence" – they could inspect the breathalyzer, experts could testify about its reliability, or they could cross examine the officer who administered the test. *Id*. at 490.

In *United States v. Parker*, 72 F.3d at 1444, the Tenth Circuit addressed the first prong of the materiality requirement under *Trombetta* in a case where a state trooper accidentally erased video footage of a traffic stop that eventually led to a search that uncovered contraband. The trooper recreated what transpired through testimony, explaining the erased video would have shown officers finding marijuana, an illegal firearm, and methamphetamine within the vehicle and one of the defendants. *Id*. at 1447-48. In upholding the district court's conclusion that the erased video footage was not exculpatory, the Tenth Circuit explained "the only way the erased

11

video tape evidence could be 'apparently' exculpatory is if it demonstrated that the events did not occur as [the trooper] related, that is, that he was lying about the events – *i.e.*, about finding the [marijuana, meth, and gun]" before searching the car. *Id.* at 1452. And, "[w]hether [the trooper] was telling the truth was essentially a question of credibility for the district court." *Id.* Corroborating evidence – including evidence that the defendants drove suspiciously and that the trooper smelled marijuana in the car when he stopped them – made it "far from apparent" that the erased footage would have exculpated the defendants "in light of the strong evidence" indicating that troopers had probable cause to search the vehicle for contraband. *Id.*

As to the second *Trombetta* prong, whether comparable evidence by other means is available, the Tenth Circuit in *Parker* also answered this question in the affirmative, explaining "along with [two additional state troopers], [the] Defendants participated in the recorded events." *Id.* Thus, "Defendants had a readily available source to replace the missing video tape—[the trooper's testimony] and their own testimony of the events" to "adduce what the missing video tape evidence showed." *Id.* Similarly, in *United States v. Ludwig*, 641 F.3d at 1254 the court explained that the defendant, much like the defendants in *Parker*, could call to the witness stand the officers involved in his traffic stop to testify as to what occurred during a portion of a deleted video recording from one of the officer's video cameras and he could also testify himself.

The Court proceeds directly to the second prong of *Trombetta* – whether the evidence is otherwise readily available – as that issue disposes of Defendant's Motion to Dismiss. The evidence Defendant seeks – proof of the firearms' location within Range Road – is available in cross examination of officers who participated in the search warrant's execution. Both Gabaldon and Garcia testified that multiple officers participated in the search warrant's execution. As in *Parker* and *Ludwig*, Defendant can call other officers who participated in the search to recreate

events. Defendant's own testimony of events is also comparable evidence. Defendant suggests that testifying would jeopardize his Fifth Amendment right to refrain from testifying. However, in *Parker* and *Ludwig* there was no suggestion that recreating evidence through the defendant's own testimony would be insufficient or run afoul of the Fifth Amendment. The court was satisfied that the defendants could recreate the disputed evidence by cross examining adverse witnesses or by testifying. Because Defendant has not shown that he was unable to obtain comparable evidence by other reasonably available means, the Court concludes that the destruction or loss of the photographs at issue was not a violation of due process under the Supreme Court's decision in *Trombetta*.

**IT IS THEREFORE ORDERED** that Defendant Nicholas Wiggins' Motion to Dismiss the Indictment **[Doc. 55]** is **DENIED**.

**IT IS SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE